**Nathan WEISS, individually and on behalf of all others similarly situated, Plaintiff,**

v.

**AMKOR TECHNOLOGY, INC., et al., Defendants.**

**No. CV 07–0278–PHX–PGR.**

United States District Court,
D. Arizona.

Sept. 25, 2007.

David S. Steuer, Karen Thomas Stefano, Keith E. Eggleton, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, David B. Rosenbaum, Maureen Beyers, Osborn Maledon PA, Phoenix, AZ, for Defendants.

## ORDER

PAUL G. ROSENBLATT, District Judge.

## I. INTRODUCTION

This is a securities class action brought on behalf of persons who purchased common stock of Defendant Amkor Technology, Inc. ("Amkor") from July 26, 2001 through July 26, 2006. The Lead Plaintiffs allege two distinct claims for violation of the federal securities laws. First, Lead Plaintiffs assert that Amkor and all the Individual Defendants (certain former and current Amkor officers and directors) made misrepresentations concerning Amkor's stock option grants during the Class Period. Second, the Plaintiffs assert that, for part of the Class Period—October 2003 through July 2004—Amkor and some of the Individual Defendants made several misrepresentations about demand for Amkor's products and forecasts about financial results.

## II. PLAINTIFFS' SUMMARY OF ALLEGATIONS

### A. Amkor's Fraudulent Stock Option Practices

Amkor's publicly disclosed stock option plan specifically identified the Compensation Committee as the administrator of Amkor's stock option program. During the Class Period, Churchill (Chairman of the Committee) and George (member) were the administrators of Amkor's stock options. Among other responsibilities, Churchill and George determined the exercise price and grant date of each stock option and made recommendations to the Board regarding any and all compensation issues. Pursuant to Accounting Principles Board Opinion No. 25 ("APB 25") and Amkor's stated accounting policies, Amkor was required to record a compensation expense whenever the Board approved an option grant with an exercise price lower than the market price on the date of the grant. Throughout the Class Period, Amkor issued tens of millions of dollars in stock options to its officers and directors, purportedly in compliance with APB 25 and Amkor's own stated accounting policies. Each of the Company's proxy statements and annual reports represented that the "compensation cost for stock-based plans is generally measured as the excess, if any, of the quoted market price of our company's stock at the date of the grant over the amount an employee must pay to acquire the stock."

The Plaintiff alleges that these statements were materially false and misleading, and the Defendants were engaged in a long-term, opportunistic scheme to (i) backdate their stock option grants to days on which Amkor's stock had reached its

lowest price in weeks if not months; and (ii) award stock options shortly before positive earnings announcements. Consequentially, each financial statement that Amkor filed during the Class Period overstated the Company's net income and understated its compensation costs.

Beginning in the spring of 2006, corporations throughout the United States began to reveal that they were under investigation for various stock option improprieties. Indeed, Amkor announced on July 26, 2006 that it formed a Special Committee and hired outside counsel to voluntarily investigate Amkor's historical stock option practices. Following the July 26 announcement, Amkor's stock price fell 17% from $7.51 per share to $6.25 per share. On August 16, 2006, Amkor admitted that the Special Committee identified numerous occasions on which Amkor failed to comply with APB 25 and GAAP, and advised investors that Amkor's previously issued financials should no longer be relied upon. Shortly thereafter, following Amkor's failure to timely file its 10–Q for the quarter-ended June 30, 2006, Amkor issued a series of press releases announcing that (i) it received a written Staff Determination by NASDAQ threatening to delist it, (ii) it was on the cusp of defaulting on its note indentures and (iii) it might need to file for Chapter 11 bankruptcy protection. The Plaintiffs maintains that as a result of these disclosures, Amkor's stock price closed at $5.05 per share on October 6, 2006, or nearly 20% lower than its closing price on July 27, 2006.

On October 6, 2006, after the close of the market, Amkor issued its June 30, 2006 quarterly report, as well as its 2005 10–K/A and 1Q 10–Q/A, which restated Amkor's previously issued financial statements for every quarter for the period January 1, 1998 through June 30, 2006 (the "Restatement"), and resulted in a $106 million aggregate restatement of net income. Amkor also disclosed that the Special Committee completed its investigation and identified evidence demonstrating that the Restatement and GAAP violations resulted from an intentional fraud:

- In connection with its annual stock option grants to employees in 1999, 2000, 2001, 2002 and 2004, the number of shares that an individual employee was entitled to receive was not determined until after the original grant date, and therefore incorrect measurement dates were used for financial accounting and reporting purposes;

- At least one former executive intentionally manipulated Amkor's stock option pricing, and that at least two other former executives may have been aware of, or participated in, this misconduct;

- At least one former executive intentionally manipulated Amkor's Compensation Committee minutes, which misrepresented the actions taken at certain Compensation Committee meetings with respect to certain of the Company's stock option grants; and

- Amkor lacked proper processes and procedures for stock option grants, which constituted a material weakness in internal controls over financial reporting.

While the named Individual Defendants are not specifically identified by the Restatement, the Plaintiffs plead that Amkor's stock options were intentionally manipulated on numerous occasions by at least one executive. According to the Plaintiffs, each named Defendant personally administered, reviewed and/or approved the fraudulent stock option grants, and received backdated stock options during those periods of transgression.

## B. Amkor's Purported Return to Profitability

The Complaint also alleges that, beginning in the third quarter of 2003, Defen-

dants issued a series of materially false and misleading statements regarding Amkor's profitability, growth and customer demand, which inflated Amkor's stock price. These statements were purportedly based on certain third-party forecasts prepared by Amkor's customers. For instance, on October 27, 2003, Defendants Kim, Boruch and Joyce boasted that Amkor had achieved a "return to profitability" due largely to "accelerating demand" and "strengthened business." According to the Plaintiffs, the Defendants either knew or recklessly disregarded that Amkor's customers were allegedly "front-loading" their forecasts to compensate for Amkor's inability to meet demand in a timely manner, and that Amkor was suffering from rising material costs due to a "supplier backlash." As a result of these material misrepresentations, Amkor's stock price increased from $16.19 per share on October 27, 2003 to a high of $21.40 per share on December 2, 2003.

On April 27, 2004, Amkor announced its financial results for the first quarter of 2004, which were significantly lower than expected because (i) Amkor was experiencing weakness in demand for its cell phone products and (ii) customer forecasts did not materialize. In an effort to offset the effect of this news, the Plaintiffs contend that Defendants issued positive guidance for the second quarter of 2004 based on allegedly strong customer forecasts. Following the April 27 disclosure, Amkor's stock price fell from $13.43 per share to $9.16 per share, marking a decline of nearly 32%. Thereafter, Amkor continued to reveal additional facts regarding its poor demand and lagging profitability, until it ultimately announced its dismal results for the second quarter of 2004; as a result of these disclosures, Amkor's stock price fell 29% on July 1, 2004 and over 12% on July 27, 2004.

## C. The SEC's Formal Investigation

On October 12, 2004, Amkor disclosed that the U.S. Securities and Exchange Commission (the "SEC") commenced an informal inquiry into certain unspecified transactions by Amkor insiders. On August 22, 2005, Amkor announced that the SEC elevated the inquiry to a formal investigation. Then, on September 15, 2006, Amkor revealed that the SEC expanded its formal investigation, and requested documents relating to Amkor's stock option practices. On April 18, 2007, the SEC filed a Complaint in the U.S. District Court for the Eastern District of Pennsylvania alleging that, during 2003 and 2004, Amkor's former General Counsel made $290,000 from at least fifty improper insider trades in Amkor shares and stock options, a practice he was responsible for preventing. The SEC's formal investigation is still ongoing.

## III. LEGAL STANDARD AND ANALYSIS

The Plaintiffs allege two distinct claims for violation of the federal securities laws. First, the Plaintiffs assert that Amkor and all the Individual Defendants made misrepresentations concerning Amor's stock option grants during the Class Period. Second, the Plaintiffs contend that, for part of the Class Period—October 2003 through July 2004—Amkor and some of the Individual Defendants made numerous misrepresentations about demand for Amkor products and forecasts about future financial results.

Section 10(b) of the Exchange Act of 1934, 15 U.S.C. 78j(b), provides that it is unlawful to use or employ "any manipulative or deceptive device or contrivance" in contravention of the SEC rules in connection with the purchase or sale of any registered security. SEC Rule 10b–5 provides that it is unlawful to (a) employ "any

device, scheme, or artifice to defraud," (b) "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make statements made, in light of the circumstances under which they are made, not misleading," and (c) "engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the security." In order to plead a claim under § 10(b)and SEC Rule 10b–5, the Plaintiffs must allege: (1) a misstatement or omission; (2) of material fact; (3) made with scienter; (4) on which the plaintiff relied; (5) which proximately caused the plaintiff's injury. *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 389 (9th Cir. 2002), *accord, In re Daou Systems Inc. Sec. Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005).

A § 10(b)/Rule 10b–5 claim must meet the exacting pleading standards of the Private Securities Litigation Reform Act ("PSLRA") of 1995. The Ninth Circuit recognizes that the PSLRA "requires a plaintiff to plead a complaint of securities fraud with an unprecedented degree of specificity and detail" and that the PSLRA standard "is not an easy standard to comply with—it is not intended to be—and the plaintiffs must be held to it." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir.2003). The Ninth Circuit also recognizes, however, that there is no bright line rule as to how much detail is enough detail, *id.*, and that the bar of the PSLRA should not be raised any higher than is required under its mandates so as not to foreclose the litigation of legitimate securities fraud actions. *No. 84 Employer Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 946 (9th Cir.2003).

Under the PSLRA, when a plaintiff alleges that a defendant "made an untrue statement of material fact" or "omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading," the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u–4(b)(1).

In addition to requiring the material misstatements and omissions be pleaded with particularity, the PSLRA requires that the complaint, "with respect to each act or omission" alleged to violate the statute, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). As interpreted by the Ninth Circuit, this scienter requirement means that the complaint "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999). This standard requires the pleading of facts that show more than simple recklessness or a motive and opportunity to commit fraud; it requires the pleading of facts that come closer to demonstrating intent. *Id.* at 974. In determining whether this standard has been met, the Court must examine not only whether each allegation is supported "by particularized facts and corroborating details," but also "whether the total of the plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that the defendants acted with deliberate or conscious recklessness." *No. 84 Employer–Teamster Joint Council Pension Trust Fund*, 320 F.3d at 931. In determining whether the complaint has shown a strong inference of scienter, the Court must con-

sider all inferences reasonably drawn from the allegations, including inferences unfavorable to the plaintiff. *Id.*

In a very recent opinion, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* —— U.S. ——, ——, 127 S.Ct. 2499, 2504, 168 L.Ed.2d 179 (2007), the United States Supreme Court held that to determine whether a plaintiff's complaint satisfies the PSLRA's strict pleading standard, a court, considering all of the facts alleged, "must engage in a comparative evaluation; it must consider, not only inferences urged by the Plaintiff, ... but also competing inferences rationally drawn from the facts alleged." The Supreme Court held that an inference of scienter must be more than merely "reasonable or permissible—it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 2510. The Court concluded that a complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

If a plaintiff fails to plead the alleged misleading statements and omissions or the defendant's scienter with the required particularity, the complaint must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6). *Ronconi v. Larkin,* 253 F.3d 423, 429 (9th Cir., 2001); § 78u–4(b)(3)(A).

## A. Loss Causation

The Second Amended and Consolidated Complaint for Violations of the Federal Securities Laws ("SAC") alleges that Amkor's SEC filings during the Class Period were false when made because, as revealed in the October 6, 2006 Restatement, the Company's financial results regarding compensation expense and net income were inaccurate due to incorrect accounting for stock option grants and stock option controls were insufficient. The Defendants maintain that the SAC is

deficient for failure to plead loss causation and must be dismissed under the standard advanced in *Dura Pharmaceuticals v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

In *Dura Pharmaceuticals,* the United States Supreme Court rejected the conclusion that loss causation is established by showing that "the price on the date of purchase was inflated because of the misrepresentation." *Id.* at 342, 125 S.Ct. 1627. Instead, the Court concluded that to properly plead loss causation in a fraud claim, a plaintiff must allege that the price fell after the truth came to light about a misrepresentation, and that the plaintiff suffered damages as a result. *Id.* at 342–43, 125 S.Ct. 1627.

The following are the Plaintiffs' loss causation allegations which they argue clearly explain the causal connection between the relevant disclosures and Amkor's declining stock price.

• On July 26, 2006, Amkor revealed that the Board formed a special Committee and hired outside counsel to investigate Amkor's stockoption practices. Following that announcement, the Company's stock price declined 17% from $7.51 per share to$6.25 per share, wiping out $222 million in market capitalization.

• On August 16, 2006, Amkor disclosed that it "identified a number of occasions on which the measurement date used for financial accounting and reporting purposes for option awards granted to certain ... employees was different from the actual grant date." Amkor also revealed that the range of potential adjustments would likely be material, and that Amkor's previously issued financials for 2005 and 2006 should no longer be relied upon.

• Between July 27, 2006 and October 6, 2006, Amkor's stock price declined near-

ly 20% due to investors' increasing concern that the Company would (i) be delisted by NASDAQ, (ii) default on its note indentures and (iii) file for Chapter 11 bankruptcy protection.

- On October 6, 2006, Amkor filed its long delayed June 30, 2006 quarterly report and the Restatement, which, in effect, eliminated these severe financial consequences. Thus, it came as no surprise that Amkor's stock price increased thereafter.

According to the Plaintiff, these allegations directly tie the relevant disclosures to Amkor's declining stock price and thus notify the Defendants of the required causal connection. The Plaintiffs contend that nothing more is required at this stage of the proceedings.

The Defendants, however, argue that the Plaintiffs cannot rely on the July 26 Release as a disclosure correcting the Company's prior statements regarding its stock option grants and, therefore, does not plead loss causation as required by *Dura*. As pointed out by the Defendant, the only mention of the stock option matter was two single sentences: "The Company also announced today that its Board of Directors has formed a special committee of independent directors to undertake a voluntary review of Amkor's historical stock option practices. The committee will be assisted by independent counsel." What the July 26 Release primarily discusses are the second quarter financial results, recent financing transactions, and a new testing facility. The release also forecasts a weak third quarter for Amkor with a flat to a 2% increase in sales from the second quarter. Since this is not a disclosure correcting the Company's prior statements regarding its stock options, the Defendants contend that it follows that the release does not plead loss causation.

The Defendants maintain that the real corrective disclosure came on August 16, 2006, when Amkor announced the initial results of the Special Committee investigation that the Company would have to restate prior financial statements because of incorrect measurement dates. Then on October 6, 2006, Amkor issued its Restatement and disclosed that certain prior grant measurement dates were incorrect, the Company had weak internal controls related to the grant process, and then Amkor specifically corrected certain financial results through the fiscal year 2005. The Defendant notes that although these are corrective disclosures which expose the misrepresentations, the Plaintiff cannot rely on them to plead loss causation for two reasons: (1) Amkor's stock price increased after these announcements; and (2) the Class Period is not extended to include them.

 As numerous Courts have concluded, *Dura* indeed requires Plaintiffs to plead loss causation by alleging that the stock price fell after the truth of a misrepresentation about the stocks was revealed. *See id.* at 342, 125 S.Ct. 1627; *Glaser v. Enzo Biochem, Inc.*, 464 F.3d 474 (4th Cir.2006). *Dura* swept away precedent holding that it is enough to show causation if the alleged misrepresentation "touches upon" the economic loss. *Dura*, 544 U.S at 343, 125 S.Ct. 1627. Furthermore, in material misstatement and omission cases, such as this one, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. *Initial Public Offering Sec. Litig.*, 399 F.Supp.2d 261, 266 (S.D.N.Y.2005). In this case, the Plaintiffs have failed to link their losses to the alleged misrepresentations by showing that the Amkor stock price dropped upon revelation of the true

state of the facts. As noted by the Defendants, once a corrective disclosure was issued the stock price actually increased.

The Plaintiffs maintain that the Defendants are essentially arguing that Plaintiffs must identify a disclosure that is a mirror image of the facts alleged to have been concealed, but contend that *Dura* does not impose this rigid requirement. According to the Plaintiffs, if the Complaint alleges that investors incurred losses once "the relevant truth [began] to leak out" then *Dura's* loss causation standard is satisfied. *Dura,* 544 U.S at 342, 125 S.Ct. 1627. The Plaintiff argues that the July 26 Release partially disclosed the fraud at Amkor, signaling to investors that the Board had identified incriminating evidence given its decision to form a Special Committee and hire outside counsel. Furthermore, the Plaintiff contends that the press release followed a series of news articles regarding improper stock option practices uncovered at various other companies; therefore, investors were acutely aware of the implications of the July 26 Release.

The Court is not persuaded by the Plaintiffs arguments. The July 26 Release says nothing about prior alleged false statements. The only mention of the stock option matter is the announcement that the Amkor Board formed a Special Committee to undertake a voluntary review of Amkor's historical stock option practices and that the Committee would be assisted by independent counsel. As noted by the Defendants, this press release does not signal, much less state, that any prior option grants were incorrect, that Amkor's internal controls were weak, that there was evidence supporting a finding that one former executive had intentionally manipulated stock option pricing or that prior financial statements were incorrect in any way. Clearly, the primary focus of the July 26 Release was a discussion of the company's second quarter results, recent financing transactions, a new wafer bumping and test facility, capital expenditures, financial liquidity and a forecast for a weak third quarter. The stock price drop following the July 26 Release cannot be the proximate result of the stock option misrepresentations and omissions alleged in the SAC. *Dura* explains that a plaintiff cannot prove loss causation where an alleged loss could be the result of changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions or other events. *See also In re Loewen Group Inc. Sec. Litig.,* 395 F.Supp.2d 211, 218 (E.D.Pa.2005).

As persuasively argued by the Defendants, the increase in the market of Amkor stock after the August 16, 2006 and October 6, 2006 public disclosures further undermines Plaintiffs' assertion that the price decline after the July 26 Release was related to the initiation of the voluntary internal investigation. If the market price increased upon the disclosures of restatement measurement dates, restated financial results back to 1998, evidence supporting a finding of intentional manipulation of stock option pricing and associated stock-based compensation by one former executive and weak internal controls, then the reasonable inference is that the price decline after the July 26 Release was not caused by the news about the commencement of an internal investigation, but by the weak third quarter outlook. Indeed, when Amkor previously announced disappointing financial results and lowered guidance, Amkor's stock market price declined.

As discussed above, courts since *Dura* routinely reject complaints that fail to allege facts that, if established, demonstrate the critical link between the misrepresentations or omissions and the investor's loss. *See, e.g., In re Compuware Sec. Litig.,* 386

F.Supp.2d 913, 918 (E.D.Mich.2005) (finding complaint failed to plead loss causation and that "[w]holly absent from its pleadings, ... is a nexus between the misrepresentations of which [plaintiff] complains and the losses they suffered"); *In re Initial Pub. Offering Sec. Litig.*, 399 F.Supp.2d 298, 308 (S.D.N.Y.2005) ("plaintiffs' failure to allege a corrective disclosure of the falsity of defendants' opinions precludes any claim that such falsity caused their losses"), *aff'd*, 2006 WL 1423785 (2d Cir. May 19, 2006); *In re Gilead Scis. Sec. Litig.*, No. C03–4999, 2006 WL 1320466, at *7 (N.D.Cal. May 12, 2006) ("[p]laintiffs' allegations regarding loss causation are simply too attenuated"); *Ray v. Citigroup Global Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir.2007) ("plaintiffs must show both that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception").

The Plaintiffs have failed to adequately allege that the July 26 Release regarding the internal investigation was a substantial cause of the drop in stock price thus the Complaint does not meet the pleading standards set forth in *Dura*.

**B. Scienter**

In addition to the failure to adequately plead loss causation, the Court finds the SAC deficient for another reason—the SAC fails to allege scienter under the applicable legal standards.

■ The Plaintiffs allege that the "Defendants acted with scienter in that the Defendants knew that the public documents and statements issued or disseminated in the name of the company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws." The Plaintiffs plead that the "Defendants, by virtue of their receipt of information reflecting the truth regarding Amkor, their control over, and/or receipt and/or modification of Amkor's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Amkor, participated in the fraudulent scheme alleged." [1]

**1. Restatement and Special Committee Findings**

■ The Defendants correctly argue that the Plaintiffs mistakenly rely on Amkor's October 6, 2006 Restatement and Special Committee Findings to plead scienter. A plaintiff cannot allege scienter simply because Amkor restated its financial statements. According to numerous courts, a mere violation of a generally accepted accounting principle (GAAP) or accounting rules fails to plead scienter. Instead, a complaint must allege specific facts that each individual defendant knew that the accounting for the subject transactions was incorrect at the time it was determined. Although allegations of accounting violations may provide some support for scienter allegations, they must be underpinned by other particularized allegations that defendants possessed the requisite mental state. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir.1994); *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F.Supp.2d 1063, 1073 (N.D.Cal. 2002) ("even an obvious failure to follow

---

1. The Court takes issue with the manner in which the Plaintiffs drafted the "Additional Scienter Allegations." This paragraph, quoted directly from the SAC, is obviously vague. The Court finds Plaintiffs' use of disjunctives particularly problematic.

GAAP does not give rise to an inference of scienter"); *DSAM Global Value Fund,* 288 F.3d at 390–91.

Furthermore, as pointed out by the Defendants, the accounting rules at issue, specifically APB No. 25, are complex and require accounting expertise and judgment. As noted by the Court in *In re Sportsline.com Securities Litigation,* the misapplication of accounting rules to a particular company's stock option grants cannot be construed as a glaring example of scienter because the measurement date criteria embodied in APB No. 25 are far from obvious. 366 F.Supp.2d 1159, 1168 (S.D.Fla.2004). Although "[a]llegations of accounting violations may provide some measure of support for the Plaintiffs' ultimate allegation of scienter," they must be "underpinned by other particularized allegations that the Defendants possessed the requisite mental state." *In re Cornerstone Propane Partners, L.P. Sec. Litig.,* 355 F.Supp.2d 1069, 1091 (N.D.Cal.2005).

█ As previously stated in this opinion, scienter can be established under the PSLRA if a complaint adequately sets forth corroborating details and facts supporting allegations of each defendant's knowledge of problems adversely affecting corporate finances. *See also* 394 F.Supp.2d at 1167. However, instead of providing such particularized allegations as to each Amkor Defendant's scienter, the Plaintiffs rely heavily on the Special Committee findings in their attempt to adequately plead the required state of mind. However, the Special Committee found evidence "that supports a finding of intentional manipulation of stock-option pricing and associated stock based compensation by [only one] former executive, including the preparation of Compensation Committee meeting minutes that misrepresented the actions taken at certain Compensation Committee meetings." Additionally, the Special Committee found "some evidence

that supports a finding that two other former executives may have been aware of, or participated in, this conduct." As noted by the Defendant, the SAC has no factual allegations linking that finding to any of the Amkor Defendants.

First, Defendants Kim, Joyce, and Khaykin are not former executives as they were all current executives at Amkor when the Restatement was filed. Second, Defendants Churchill and George were never executive officers at Amkor, and Defendant Churchill was actually a current Amkor director when the Restatement was filed. Third, Defendants Freeman and Kyahkin did not become executive officers until January 2004 thus could not have been involved in the options issued in 2001 and 2002. Furthermore, Defendant Freeman left Amkor in August of 2004; therefore, he could not have manipulated stock option grants through June 2006.

The Plaintiffs argue that the SAC alleges particularized facts to collectively establish that the Defendants were Amkor's gatekeepers when it came to administering, recommending and approving the terms of stock options grants; thus the backdating scheme could not have occurred without their individual knowledge and/or participation. However, in essence, the Plaintiffs have done little more than alleged the Individual Defendants' respective board or executive positions. To infer scienter by virtue of a position in a company "would eliminate the necessity for specially pleading scienter, as any corporate officer could be said to possess the requisite knowledge by virtue of his or her position." *In re Autodesk, Inc. Sec. Litig.,* 132 F.Supp.2d 833, 844 (N.D.Cal.2000).

For example, the Plaintiffs maintain that Defendants Khaykin and Freeman "had significant control over the Company's stock option practices," but the SAC fails to cite any facts in support of this conclu-

sion other than the Defendants' positions as COO. In addition, as to Defendants Churchill and George, the Plaintiffs merely plead their membership on the Compensation Committee and their signatures on the annual form 10–Ks during each director's tenure with Amkor. There are no particularized allegations relating to these Defendants' notice of the stock option accounting or the particular activity that lead to the October 6 Restatement. The Special Committee's identification of evidence that the Compensation Committee meeting minutes prepared by a former executive misrepresented certain actions taken by the Compensation Committee does not raise a strong inference of scienter as to Churchill and George. What is missing from the SAC regarding the outside directors' scienter are factual allegations setting forth what information was presented to the outside directors about any of the alleged misrepresentations, omissions, GAAP violations, etc. that put them on actual or constructive notice of fraudulent activity. *See, e.g., Wojtunik v. Kealy,* 394 F.Supp.2d 1149, 1169 (D.Ariz.2005). Clearly, the Plaintiffs plead no facts to indicate that these directors knew of or participated in any such actions or that they recklessly disregarded wrongdoing by someone else.

■ The Plaintiffs allege that Defendants Kim, as CEO and Chairman, and Defendant Joyce, as CFO, executed sworn certifications pursuant to the Sarbanes–Oxley Act of 2002 ("SOX"), 15 U.S.C. § 7262, which falsely attested to the accuracy of Amkor's financial statements and the effectiveness of its internal controls for every fiscal quarter from June 2002 through 2006. According to the Plaintiffs, the SOX certifications may provide additional evidence of scienter on the part of the certifying officers. The Court, however, finds Plaintiffs assertion unpersuasive. SOX certifications may provide additional evidence of scienter if a plaintiff alleges

that not only were the certifications false and misleading, but also that the defendants had actual knowledge of their false or misleading nature or were deliberately reckless in issuing such statements at the time. *Limantour v. Cray, Inc.,* 432 F.Supp.2d 1129, 1160 (W.D.Wash.2006). The Plaintiffs cite *In re Lattice Semiconductor Corporation Securities Litigation,* to support their scienter allegations, but the Court finds such reliance misplaced. 2006 WL 538756 (D.Or. Jan. 3, 2006). *Lattice* presented a significantly greater number of facts concerning inference of scienter than exists in the instant case. For example, in *Lattice,* the plaintiffs' allegations demonstrated that the company's former controller "made improper journal entries with the knowledge of at least some of the individual defendants." *Id.* at 32. Moreover, the Lattice plaintiffs provided evidence of specific internal reports, databases and meetings, the purpose of which was to keep the individual defendants informed of the company's financial situation during the relevant time period. *Id.* Other than general assertions about the Individual Defendants' roles and responsibilities and motivations, the Plaintiffs do not plead specific facts to support their allegations of scienter.

#### 2. Motive Allegations

■ The SAC also pleads scienter based on a motive to engage in fraud; however, the Ninth Circuit has concluded that allegations of a defendants' motive to engage in fraud alone are insufficient to plead scienter. *Silicon Graphics,* 183 F.3d at 979. The primary motive allegation in securities fraud cases is that the defendant was motivated to, and did, sell his company stock based on nonpublic material information for a direct personal profit. *See, e.g., Wojtunik,* 394 F.Supp.2d at 1165–66. In this case, there are no allegations that any Individual Defendant sold Amkor stock for

personal gain. Instead, the Plaintiffs assert that Defendants' motive was to manipulate the exercise of price options that they then awarded to themselves. However, missing from the SAC are any allegations that any individual defendant realized any direct economic gain from Amkor stock options. An option is the right to purchase the underlying security, and there are no allegations that any named defendant exercised his Amkor options and sold the stock for gain.

The Plaintiffs also allege that the Defendants' motive was to grant options at opportune times when the stock price was low. The SAC asserts that the Defendants were motivated to make such opportune timed grants at a lower price so that if and when the options were exercisable, the grant holders might be able to sell the underlying stock for greater gain. Although the SAC contains several three-month graphs purportedly to show a few instances of such opportune timing, there are no particularized facts supporting this motive allegation. Absent are any specific factual allegations that during the Class Period any officer or director defendant was involved in or was aware of the stock option practices and pricing manipulation discussed in the Special Committee's findings.[2]

### 3. Allegations Regarding Defendant Boruch

■ The SAC alleges that the Plaintiffs undertook an investigation to identify the former executives referred to in the Spe-cial Committee report, but that the information remains in the exclusive control of the Defendants. Specifically, the Plaintiffs plead the following:

> [I]nformation obtained from a confidential witness and from the company's public filings supports a strong and reasonable inference that defendants Boruch, John Doe # 1, John Doe # 2and John Doe # 3 knew, or were reckless in not knowing, that Amkor had improperly accounted for its stock option grants.

However, the Plaintiffs do not provide a description of the information obtained from the confidential source nor do they identify the public filings which allegedly support the strong and reasonable inference that Defendant Boruch knew, or was reckless in not knowing, that Amkor had improperly accounted for its stock option grants. Furthermore, when using an unnamed confidential source to support their allegation, the Plaintiffs are required to describe the witness with sufficient particularity to support a probability that a person in the position occupied by the confidential witness would possess the information alleged. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir.2004). Moreover, the Plaintiffs fail to even allege rudimentary information regarding this confidential source such as the dates of employment. *See Limantour*, 432 F.Supp.2d at 1143 (failing to provide the dates of employment of a confidential source described as a "fatal flaw"). The SAC simply states that Confidential Wit-

**2.** Furthermore, the SAC fails to allege that the outside directors Churchill and George received any options. The absence of such allegations defeats an inference of motive to Messrs. Churchill and George. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir.2002) (no inference of scienter where CEO was the only insider who allegedly sold stock); *Pension Fund v. Adecco S.A.*, 434 F.Supp.2d 815, 834 (S.D.Cal.2006) (holding the same). Although the Plaintiffs admit that they cannot ascertain whether Churchill and George received stock options without discovery, they argue that given their service to the Company since 1998 and 1997 respectively, there is a strong likelihood that they both benefitted from these backdated option grants. However, the Plaintiffs offer no legal authority to support this assertion, and the Court, likewise, is aware of none.

ness "A" is a former Senior Vice President of Northern Asia Operations at Amkor and knew most of the company for nine years. The Plaintiffs must plead "with substantial specificity" how Confidential Witness "A" came to learn of the information they provide in the complaint. *See, e.g., In re Northpoint Communications Group, Inc. Sec. Litig.*, 184 F.Supp.2d 991, 999–1001 (N.D.Cal.2001). The SAC falls far short of the required specificity with regard to Confidential Witness "A."

■ The Plaintiffs allege that Defendant Boruch had significant control over Amkor's stock option practices because of his "high level position with the company." As previously noted, an allegation that a defendant knew or was deliberately reckless in not knowing the falsity of a statement by virtue of his or her position within a company is insufficient. *See, e.g., In re Infineon Technologies AG Sec. Litig.*, 2006 WL 2925680 *2 (N.D.Cal.2006). Furthermore, the SAC does not allege that this high-level position had anything to do with stock option granting practices.

The Plaintiffs also allege that Defendant Boruch's considerable control over Amkor's stock option granting practices arose through his relationship with the Senior Vice President of Human Resources, Catherine Loucks, who was married to Boruch during the class period.[3] The Plaintiffs further assert that there is a strong basis for the inference of Boruch's involvement in light of the Special Committee's finding that Amkor's Human Resources personnel were inappropriately allowed to control and administer the stock option grant process without adequate input or supervision. However, the Court declines to make such a leap in logic. Although the Plaintiffs' allegation regarding Defendant Boruch's personal relationship with the Senior Vice President of Human Resources might be a conflict of interest, it does not strongly compel an inference of scienter on the part of this Individual Defendant.

The Plaintiffs, through their Confidential Witness "A" contend that Defendant Boruch greatly favored the use of stock option grants as a form of employee compensation, and that Boruch often pushed for issuance of stock based compensation because he felt that stock options were a good moral booster for employees. Even if the Plaintiffs had plead the required information regarding their Confidential Witness "A", the assertion that Defendant Boruch favored stock option grants due to their ability to boost morale does not advance Plaintiffs' theory that Defendant Boruch engaged in fraudulent activity. As noted by the Defendants, this allegation does nothing more than demonstrate this executive's interest in retaining quality employees.

### 4. Amkor's Scienter

■ Under Ninth Circuit law, "a defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter." *In re Apple Computer, Inc. Sec. Litig.*, 243 F.Supp.2d 1012, 1023 (N.D.Cal.2002)(*citing Nordstrom, Inc., v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435–36 (9th Cir.1995)). The Ninth Circuit has rejected the concept of "collective scienter" in attributing scienter to a corporation. *Nordstrom*, 54 F.3d at 1435–36. Since this Court concludes that the SAC fails to adequately plead scienter as to the Officer and Director Defendants, the SAC also fails to plead Amkor's scienter.

### C. Forecasting Allegations

As a separate claim, the Plaintiffs assert that Amkor and the Officer Defendants

---

**3.** The Plaintiffs do not allege when in the Class Period this marriage took place.

(excluding Churchill and George and the John Doe Defendants), violated the Federal Securities laws between October 2003 and July 2004. The Plaintiffs contend that several statements made during those months of the Class Period concerning Amkor's consumer demand, material costs and its 2004 first and second quarter forecasts of financial results were false when made.

The claim is based on (1) the October 27, 2003 press release including the forecast for the 2003 fourth quarter and the related positive forward-looking statements; (2) the November 3, 2003 Form 10–Q with alleged substantially similar statements concerning the Company's operations and financial condition; (3) the Prospectus Supplement filed November 4, 2003 including prior financial statements and the Registration Statement by reference and stating that Amkor could "absorb large orders and accommodate quick turn-around times," and Amkor was in a "position to obtain low pricing on materials and manufacturing equipment," (4) the January 28, 2004 earnings release with the forecast for the 2004 first quarter and positive forward-looking statements and (5) the 2003 Form 10–K field March 4, 2004 with allegedly "substantially similar statements" concerning Amkor's operations and financial results.

The Plaintiffs assert that when the October 2003 through March 2004 statements were made, the Officer Defendants knew or recklessly disregarded that demand was not accelerating as customers were front-loading their forecasts sent to Amkor, Amkor was experiencing rapidly rising material costs due to supplier backlash, and Amkor had weak internal controls and accounting systems that prevented Amkor from efficiently managing material costs and forecasting demands. As argued by the Defendants, these conclusory assertions fail to comply with the PSLRA's particularity requirements. The Plaintiffs are required to allege facts supporting these conclusions—such as which customers were supposedly front-loading forecasts, when and by how much, how much material costs were rising, when and how that was affected by the forecasts, and which internal controls were deficient, how and when. See Ronconi, 253 F.3d at 431. Furthermore, the Plaintiffs cannot rely on Amkor's April and July 2004 announcements to plead that the earlier statements were false when made or made with fraudulent intent as this is a clear "fraud by hindsight" pleading approach abolished by the PSLRA. See Wojtunik, 394 F.Supp.2d at 1161–62.

## 1. Confidential Witnesses

■ The Plaintiffs' claim is supported by information purportedly gathered from five confidential witnesses. The Defendants argue that Plaintiffs' reliance on these unidentified confidential witnesses ("CW") fails to satisfy the PSLRA's pleading standards as the CW allegations fail to provide the required specific facts. The Defendants maintain that the CWs allegedly were lower level employees with vague and generalized job responsibilities at Amkor at various times. Indeed, the Defendants point out that CW1 was not even employed at Amkor during the time relevant to the claim. Furthermore, the Defendants note that absent from the SAC is any claim from any CW that the allegedly false statements at issue were false when made. Rather than providing support for the Plaintiffs' claims, the Defendants assert that the CWs only convey routine company problems, vague or alleged instances of customer conduct at unspecified times, or the CWs' opinions. The Plaintiffs respond that the their confidential sources are reliable, corroborated and described with the requisite particularity.

■ The precise amount of detail required in describing CWs varies based on the circumstances of the case; and the Plaintiffs are not required to name witnesses. *In re Secure Computing Corp. Sec. Litig.*, 184 F. Supp 2d 980, 988 (N.D.Cal.2001); *see also Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir.2000). In order to contribute meaningfully toward a strong inference of scienter, allegations attributed to CWs must be accompanied by sufficient particularized detail to support a reasonable conviction in the informant's basis of knowledge. The Plaintiffs must plead "with substantial specificity" how the CWs came to learn of the information they provide in the complaint. *In re Northpoint Communications Group, Inc. Sec. Litig.*, 184 F.Supp.2d 991, 999–1001 (N.D.Cal. 2001).

In *Daou Systems, Inc. Securities Litigation*, the Ninth Circuit stated that the plaintiffs therein described the CWs with a "large degree of specificity" where they (1) numbered each witness, (2) provided his or her job description, and (3) described his or her job responsibilities. 411 F.3d at 1016. Although in most instances the Plaintiffs provide the Court with basic information such as job titles and dates of employment, the Plaintiffs fail to provide a detailed basis for the CWs personal knowledge. Furthermore, the Court concludes that the CW allegations are simply too vague to support the PSLRA's pleading requirements.

■ The Plaintiffs allege that CW1, a former account specialist with Amkor from June 1997 to January 2003, explained that "inflated forecasts occurred because senior management failed to implement a centralized and effective forecasting system." According to CW1, "there was no strategic direction from the top on how to fix the forecasting system and better manage the account representatives." However, this allegation is simply CW1's purported opinion and offers no supporting facts as to the identity of "senior management," which forecasts were supposedly inflated and how, and what problems existed with management of the account representatives.

Next, the Plaintiffs allege that CW2, a former customer service and account manager with Amkor from January 2002 to February 2004, stated that Amkor was suffering from internal and external communication difficulties in later 2003. However, as the Defendants note, absent are specific facts such as which members of management, projects or manager were involved, or when these events supposedly occurred. Although CW2 alleges that "upper-level management was also ineptly communicating with the Company's suppliers, as evidenced by the deficient raw materials forecasts it provided to them," there are no facts identifying the particular members of management and/ or the suppliers at issue nor which forecasts were made or how they were allegedly "deficient."

The Plaintiffs' CW3 is alleged to be a former senior accounting specialist employed by Amkor between 2002 and March of 2005. CW3 states that Amkor's raw material cost management and accounting systems were insufficient due to the fact that the Company suffered from widespread internal control weaknesses. However, this is simply an unsupported vague conclusion that does not satisfy the PSLRA.

The Plaintiffs CW4 and CW5 also fail to meet the pleading standards mandated by the PSLRA and applicable case law as they merely reflect matters that companies deal with on a daily basis. Although these allegations may support an inference of negligence in the operations of the Company, they do not show that a fraudulent scheme was undertaken by the Defendants. *See, e.g., Sorkin, LLC v. Fischer*

*Imaging Corp.*, 2005 WL 1459735, at *9 (D.Colo. June 21, 2005); *Wenger v. Lumisys*, 2 F.Supp.2d 1231, 1247 (N.D.Cal.1998) ("All businesses from time to time suffer management problems and product delays, but many manage to 'do very well' despite those commonplace business wobbles.")

The Court notes that the SAC does generally describe the CWs job titles; however, the SAC fails to allege facts showing how the CWs possess the information attributed to them, that the CWs were involved in Amkor's forecasting process or that the CWs were in a position to possess knowledge about the forecasting process. *See, e.g., Limantour*, 432 F.Supp.2d at 1142 (rejecting CW allegations for failure to provide facts showing how CW, a senior financial analyst, became aware of the company's alleged internal weaknesses). Furthermore, there is no allegation by any CW directly asserting that the statements at issue were false.

**2. Safe Harbor Provisions**

 In addition, the forward-looking statements in the October 2003 through March 2004 releases cannot support the Plaintiffs claim for the additional reason that they are immune from liability under the Reform Act's safe harbor provisions. The Safe Harbor provision immunizes from liability "forward looking" statements either accompanied by "meaningful cautionary statements" or "immaterial." 15 U.S.C. § 78u–5(c). A forward looking statement includes: (A) a statement containing a projection of revenues, (B) a statement of the plans and objectives of management for future operations; (C) a statement of future economic performance; and (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A)(B) or (C). *Id.* at 78u–5(i)(1); *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1132, n. 3(9th Cir.2004); *GSC Partners CDO Fund v.*

*Washington*, 368 F.3d 228, 242–43 (3d Cir. 2004). Furthermore, "historical or present-tense statements can qualify as forward-looking if the truth of the statement cannot be discerned until some point in time after the statement is made." *In re Tibco Software, Inc. Sec. Litig.*, 2006 WL 1469654, at *26 (N.D.Cal. May 25, 2006)(holding statements were forward-looking and accompanied by meaningful cautionary language)

As shown by the Defendants, the October 27 and January 28 releases (and the April 27 release) are forward-looking statements. The October 27 release contained the following statement: "We are encouraged that strengthening customer forecasts may partially offset the seasonal weakness typical of our first calendar quarter [of 2004]." The January 28 release contained this statement: "We see 2004 as a year of great promise for Amkor." Finally, the November 4, 2003 Prospectus Supplement stated that Amkor could "absorb large orders" and was in a "position to obtain low pricing."

Furthermore, all the announcements were accompanied by meaningful cautionary language. For example, the October 27, 2003 and the January 28, 2004 press releases identify that they include forward-looking statements which involve "a number of risks and uncertainties" such as the "highly unpredictable nature of the semiconductor industry; volatility of consumer demand for products incorporating our semiconductor packages … timing and volume of orders relative to the production capacity … dependence of raw material and equipment suppliers." The Court concludes that each statement has meaningful cautionary language sufficient to satisfy the Safe Harbor provisions.

**3. Non–Actionable Puffery**

 The Defendants also argue that some of the statements in the aforemen-

tioned releases are mere puffery and therefore not actionable. It is true that "vague, generalized and unspecific assertions" of corporate optimism or statements of mere puffing cannot state actionable material misstatements of fact under the federal securities laws. *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir.2003); *Cornerstone*, 355 F.Supp.2d at 1087. Some of the statements challenged by the SAC are, indeed, puffery: "We are encouraged that strengthening customer forecasts may partially offset the seasonal weakness typical of our first calendar quarter;" "Over the past two years we have made substantial progress enhancing the profitability of our business;" "We believe that 2004 will present exceptional growth opportunities for Amkor;" "We see 2004 as a year of great promise for Amkor." *See, e.g., In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F.Supp.2d 1059, 1076–77 (N.D.Cal. 2001) (holding as puffery: "strong" demand, "better than expected" or "robust" results, "well positioned company"); *Limantour*, 432 F.Supp.2d at 1146 (holding as puffery: statements about being "very optimistic and expecting 2004 to be good, confident with prospects for growth"). Claims based on the statements will be dismissed for this reason as well.

## IV. CONCLUSION

Based on the above analysis, the Court concludes that the SAC should be dismissed in its entirety as it falls short of the PSLRA's stringent pleading requirements. The stock options allegations are insufficient to state a claim of fraud due to the Plaintiffs' failure to adequately plead loss causation as well as insufficient allegations giving rise to a strong inference of the Amkor Defendants' scienter. Specifically,

the SAC's recitation of the Special Committees' findings in the Restatement fails to provide specific facts relating to the Amkor Defendants' scienter. While the Special Committee did uncover some evidence of misconduct attributable to former executives, this does automatically give rise to a private cause of action under federal securities law. Furthermore, the SAC's claim concerning statements made from the end of October 2003 through March 2004 were false when made is deficient as the Court finds said statements, as plead, immune from liability under the Safe Harbor provision of the Reform Act. Accordingly,

IT IS ORDERED that the Amkor Defendants' Motion to Dismiss the Second Amended and Consolidated Complaint for Violations of the Federal Securities Laws (Doc. 105) is GRANTED.[4] The Clerk is directed to close the case. After filing three different versions of their Complaint, the Plaintiffs will not be given another opportunity to satisfy the PSLRA's pleading requirements.

IT IS FURTHER ORDERED that Defendant Boruch's Motion to Dismiss the Second Amended and Consolidated Complaint (Doc. 107) is GRANTED.

IT IS FURTHER ORDERED that the Lead Plaintiffs' Motion for Relief from the PSLRA Discovery Stay (Doc. 88) is DENIED as MOOT.

---

4. Although the Court only provided analysis regarding the Plaintiffs' Section 10(b) and Rule 10–b5 claims, it follows that the Plaintiffs Section 20(a) claims for controlling personal liability are dismissed as well.